Turn to Case No. 24-20551, Guenther v. BP Retirement et al., and we will begin with George Hicks for the BP Retirement Plan. Thank you, Your Honor, and may it please the Court, George Hicks for the Appellants. The District Court's judgment in this case was the result of numerous fundamental flaws, any one of which requires reversal, and almost none of which plaintiffs seriously defend. First, plaintiffs do not satisfy Article III's causation requirement. In the opening paragraph of their complaint, plaintiffs allege that they brought this suit to, quote, remedy a pension shortfall caused by BP's breach of fiduciary duties, end quote. But plaintiffs' claimed injury, namely the pension shortfall, was not caused by the breach of fiduciary duties that plaintiffs alleged and the District Court found, namely the supposedly inadequate communications in 1989 when the ARP was converted to the RAP. How many times did you raise this jurisdictional threshold problem? Your Honor, we raised it possibly half a dozen times. We raised it at the outset of the case where Judge Harmon actually did, that the first judge on the case did dismiss the complaint for lack of Article III standing. We then raised it, I know that we raised it in a 12B1-6 motion. Summary judgment, pretrial. In the 57 pages of law and fact conclusions, does the District Court address causation? It does not, Your Honor. We raised, so this is not some sort of surprise jurisdictional argument that we're making for the first time on appeal, but we did raise it over and over and over. And indeed, had the 1989 communications said exactly what plaintiffs argue they should have said, plaintiffs would still face the same pension shortfall confirming the absence of the causal link necessary for Article III standing. And I know you know this case well, but you don't, you do or you don't dispute that at least the allegation in paragraphs 86 did state their misrepresentations caused us sort of a reliance injury because we might have just switched jobs. We might have pursued a job that would give us a better retirement package. Your Honor, they do allege that in their Second Amendment complaints. As we say in our brief, I think there's a couple of problems with that. Number one, I think it's awfully speculative. But number two, this was not proven at trial. It is their burden as transunion states, as this Court's opinion in Ortiz states. They have to prove at trial, of course, their allegations, but also their Article III standing. And the District Court just never made a finding of fact on it? It did not, Your Honor. And there was no testimony to that. In 1989, they did say it could go down for some people, that the people who are 50 and older would all stay cubbied, but anyone under that, they were hoping it would go up, but it might come down. Didn't they tell them that? Your Honor, you're absolutely correct. In 1989? And so they could have left if they didn't like that, or they could have just hoped that it would work out. Your Honor, they were told that not everyone was guaranteed a higher benefit under the new plan. They were specifically told... If they were under 50. If they were under 50, they were specifically told that if you are 50 or above, you will get the greater of your ARP or RAP benefit. But they were also told that some employees might not. They were shown a presentation with a script that said the exact same thing, which is they've actually shown an example of an employee who would receive a lower benefit under the RAP than under the ARP. And the script actually said, as you can see, the RAP provides larger benefits at most ages during a career. So they were very much told that. They were also told in 1989, in the opening letters, providing their opening balance and their current balance, that this statement is based on certain assumptions about the future. The numbers in these charts are for illustrative purposes only. So this is going to whether... Obviously, the district court did make a lot of findings of fact as to misrepresentations. We've got Stanley Sporkin, right, back then also addressing these. But we start withstanding, correct? We start withstanding, and you can end withstanding, Your Honor. Absolutely. I mean, these are other problems. With your position on standing, does it require us to assume that all the levels of courts in the Amara litigation, district, circuit, Supreme Court, actually all decided things in a case where plaintiffs similarly situated to yours didn't have standing? I think you don't have to assume that, Your Honor. And here's why. Now, I would say that because those courts never addressed Article III standing, you wouldn't need to be bound by anything that was implicit in that. We would implicitly saying the Supreme Court issued a huge opinion without confirming that it had jurisdiction. Well, no, Your Honor, and here's why. Here's why. So if you look at, and I understand that Amara case went up and down many, many times. But the Supreme Court actually said, and this is at page 432 of its opinion, that the district court confined the case to, quote, only employees whom defendant's disclosure failures had harmed, end quote. And if you go back and look at the, excuse me, the district court's decision, and this is at 534 fed sub seconds, at 354, the district court notes the testimony by the plaintiff in that case, which is exactly what we don't have here, going back to the allegation about. So they alleged a reliance injury, but they didn't prove it. In this case, correct. In Amara. But all your motions challenging standing were, pretrial were based on they didn't even sufficiently allege it. Well, we think that that in itself is just too speculative. I mean, if you look at. But just to, you enjoy the pushback. I mean, ERISA's premised around that employers will be honest about the retirement package. And we all know we make financial planning decisions based on what's my retirement going to be? Are they going to match the 401k, whatever? So isn't it sort of just obvious that it would be material? Your Honor, I don't know if it's completely obvious, because first of all, the statement, I mean, it kind of goes back to the point about the statements actually being completely truthful. But as I understand your statement, I don't know. I'm just trying to resolve the jurisdictional thing because we have to get through that first. Sure. And I think that, you know, you can just look to the fact that there was no testimony. So this isn't like Amara. It's not like the Turner case that they cite where there was even sort of an affidavit proving this and the plaintiff's testimony. But your summary judgment motion was denied. It was denied in one sentence. In one, I agree. But so so they would they would have thought, then we go to trial and we've already had standing confirmed. Well, I believe that at one of the and that there were a number of orders in this case. And I think the standing actually was said to with reservation to reassert. It was. You're right. Good memory. Yes. And so and so there are a lot of ways to be another Amara. I hope not. But but yes, it was denied without prejudice to reassert standing at trial. And so, again, that's actually consistent with this court's decision in Ortiz and TransUnion that say that you have to the burden is on the plaintiff's. And it's actually a harder burden under Ortiz to prove that at trial. And they never did. So it was certainly they were on notice to do it. And I do want to point out that that's not even their theory here in this court. They don't they don't they sort of abandoned that argument. Well, they say alone. Remember, they use the word alone. It implied they still think the reliance interest is one. They just have others. Broken promise is another. I didn't see them as exclusive. We'll hear from opposing counsel. I guess I didn't see much expounding on that. But I agree. But they sort of turned to redefining the injury, which I think is completely allied by the record in this case. So how is your how would your standing theory apply in a FOIA type situation? I mean, because essentially what we're talking about here is a lack of information that plaintiffs think they were owed to them by the defendant. So what about in a FOIA case? Same thing. It's that some citizen is seeking information from the government. I mean, I guess I would go back to the TransUnion case, which sort of floats the idea of an informational injury. But even TransUnion says you still have to to make the causal link. And what's the causal link in a FOIA case? I suppose there it would be. Because FOIA, you know, one of the standards is you don't have to prove a need to know. Citizens just, you know, right there, wrongly, Congress has made the call that citizens have the right to seek government documents. Well, Your Honor, I think that in that in a FOIA context, which, you know, certainly I think is different here, but it would be. It may be different. That's why I'm asking is how would your standing theory apply or not apply in FOIA? I don't know if it would apply.  Because I think that the purpose of ERISA and the requirements of ERISA, you know, I don't think there's a match between the causation and the injury. Whereas in FOIA, the entire purpose of the statute is to provide that particular remedy of the information. And here, the injury that they've alleged, I mean, the injury they allege was the pension tour fill, and it's the injury that was remedied. So that's exactly what they wanted and they asked for. But it has no causal connection to the violation that they alleged. I guess they're just saying, though, if you told me honestly about my retirement situation, I might have gone to a different job or I might have reallocated my risks. I think that if, you know, they could allege that, certainly, but I think the very fact that they didn't prove that at trial shows that it was speculative here, which under FDA v. Hippocratic, I think, is a legitimate concern. And I think that it also goes to the fact that the benefit here, it wasn't just money. I mean, there were many other advantages to the new plan. There was portability. There was larger accrual at an earlier age. There was a better death benefit. So there were actually many more advantages to this than just, you know, what it might be 20 years later. Quickly on Repose and 413. Obviously, that's an independent ground for you. And the primary, how many different aspects of 413 would defeat Repose? One is six years since, and then we correct. The other one relates to when they would have discovered it or when they did discover it. Your Honor, there's two independent ways that Repose would and does apply here. The first is that no action may be convinced after the earlier of six years after the date of the last action constituting part of the breach or violation. And we have that here. You said that's 1989? That's all 1989. And that's the pleadings and the decision are replete with information that says that this is all about the statements in 1989. But the second way is the actual knowledge problem. And so this is three years after plaintiff's actual knowledge of the breach or violation. And on that note, I want to just make sure that if you read nothing else in this case, I implore you to please read. We do read. And I understand it's a huge record. This is a long litigation. But please read the statements from Mr. Gunther's Yahoo group. And this is 2011. This is February 2013. So there's other stuff in 2011. 2011 establishes actual knowledge altogether because Mr. Gunther writes BPCNA, when BP converted us to a cash balance plan, it was presented as the best thing since peanut butter and jelly, we screwed up and believed BP. And then in July 2011, the administrator of the plan writes back, says the concern was raised that when the benefit was converted in 1989, it did not accurately project the future accrual. And it goes on to explain why it wasn't going to change things. But February 2013 is the Rosetta Stone of Mr. Gunther's and the plaintiff's actual knowledge. And this is at record 21-201, 21-202, 29-787 to 88. And I'm just going to read a couple of things with your indulgence. This is in February 2013, more than three years before the April 2016 lawsuit. As many of you know by now, when we were converted to the BP RAPA plan in 1989, we were made several promises that were not kept. And again, when the forced conversion took place in 1989, we were told by BP managers that the new plan would provide a benefit to career employees that is comparable to the fully competitive benefit under the prior plan. This turned out to be a very false statement. And then one more, this is at 29-787. In 1989, Mr. James Ross and HR leaders made many misleading and incorrect statements at town hall meetings relative to the advantages and expectations of the defined contribution. So you're saying that's actual knowledge? This is absolute, absolute, sorry, actual knowledge in February 2013. Now, we already have it in 2011. And if there were a fraudulent concealment finding by the district court, first you say there isn't one. But if there were, you would say these same points of the record show that they knew at that point? They absolutely knew, Your Honor. This is the exact, this is their case. This is the theory of liability. This is the damages they wanted. A number of these incorrect and misleading claims are documented in the letters from BP management and literature distributed at the time of the change. There's no fraud here. There's no concealment. You have other issues. Your tie is running out. Would you agree if we had to reach the 23b2 reformation issue, the position you're taking is in tension with at least two other circuits? Do you agree with that? I believe if you're talking about the 23b2, the very last portion, I think it's, I don't know if it's in tension, but I don't think that this court has ever talked about it. Amara and Johnson did seem to recognize that that would be available relief. I believe Amara certainly did. I'm not certain about Johnson. But if you have to make it all the way there and have found that there is causation and there is this suit is not time barred and that these are the proper defendants and that the statements in 1989 were actually false and misleading, then you would have to address that, Your Honor. Can I go back to my FOIA analogy? Is your point that in FOIA, the injury is the informational transunion type injury, whereas here, I take it they're a sort of injury, it's not lack of information, it's lack of money. As they pleaded and tried this case, it's lack of money. Did they ever plead just a pure informational injury type theory? Not the injury. I mean, part of their... It's in the backdrop, obviously. It's part of the merits case. This case is all about getting the pension shortfall. And that's exactly what they got. And they got something that is 180 degrees opposite of what the plan promised. Which means the crux of your standing theory is the lack of reliance. I would say it's a lack of causation. I would say it's a lack of causation. Through lines. The only reason I differ slightly is because the Amara case, which I don't think is going to win any prizes for clearest decision ever at the Supreme Court, but it says that detrimental reliance is not required, but causation still is. And that's at page 444. The court says that a plaintiff, quote, must show that the violation injured him. And there must be harm and causation. I get that there's different terminology. Sorry to interrupt. Different words. But essentially, the way to establish causation, if you can, would be, I presume, through reliance. I think it would. And I think it would in an Article III causation sense.  At least I'm not aware of how else you get Article III causation without reliance. No, I guess I was just turning it around to say, you know, you look at what caused it. But if you want to look at it from a reliance viewpoint as well, I think that's fine. Okay. Thank you. You've saved time for rebuttal. We'll now hear from Susan Weeks for Frederick Gunther et al. Good morning. May it please the Court. Starting with a fundamental precept of ERISA, that fundamental precept is that if an employee has been promised a benefit in a defined pension plan that upon retirement, that that promise will be fulfilled and they will receive that benefit. And that's from the Notchman case. In this instance, these employees were promised a benefit and did not receive it. And that walks you into the Article III standing. There's been some questions this morning about, well, do you need reliance? That was briefed, Judge Higginson, in the opposition of the motion to dismiss before Judge Heenan. And at that time, we argued detrimental reliance was not required. Nor does AMARA require detrimental reliance. What AMARA requires detrimental reliance on is only for surcharge. And that's not our case. Our case is plan reformation. It's clear in the law that when an employer makes representations about plan performance, that they're speaking to the future of the plan and they must speak truthfully, and that employees have the right to rely on that because they are allowed to presume that they can trust in those representations. That's your reliance. And it comes straight out of this circuit's discussion in Martinez v. Schlumberger. Those employees are entitled to rely on what they are telling them will be the benefit that they get as a pension benefit. So I understand all of that. What's the evidence that plaintiffs did rely? So. That they would have left had they only been told honestly, et cetera. Sure. At trial, one of the employees testified they never went that far because if you don't know something, you can't make an alternative decision. When you say one of the employees, which employee? I believe it was Les Owen. Excuse me? Les Owen. Leslie Owen. Do you have a record site? I do not. I apologize. Was that a finding of fact by the district court in the 57 pages? I do not believe in the 181 pages that the judge specifically said they would have or could have made alternative employment decisions, made different planning or looked at other employment. And you agree, BP repeatedly asked the district court to make a finding about that. They made a district court to make a finding on standing. They did not ask the district court to find there was reliance. Well, but you just heard causation, the second prong traceability. You said they lied to us in 1989. And I know you're going to get to the repose issue, but it's got to be, you've got to say that those lies injured you somehow. And I saw it pled. If we look at. We would have left to a better arrangement. You're saying Les Owen then said it at trial, but the district court never made a finding fact on it. They did not make a specific finding that these employees had detrimental reliance, no justice or judge. But to go back to what you said before, I think what you were saying is something of the effect of they never talked about causation because they never. So your answer to me earlier, I'll just ask my question again, and we can have that exchange. What is the evidence? I grant you your opening that this is about reliance and all that. What is the evidence that there was actual reliance here? So the evidence that we have at trial is that this affected them in a personal way because they were promised a benefit. They did not get. And on the Spokio versus Robbins prong, it was not abstract. The experts showed that the promise was not true and they did not get what was promised. We're still waiting for causation evidence. That's evidence of false, false evidence. That's evidence of injury. I get all of that. What is the evidence of causation? There are immaterial frauds all the time, right? Somebody who lies through their teeth and nobody cares. Those are not actionable and I guess those are also no standing. What is the evidence of causation here? The evidence is they worked under the mistaken belief. Remember, this is a unilateral contract. So it is an offer and the employee's performance is to continue their employment, understanding that's the benefit they're going to get at the end of their career. That's your fairly traceable. But they did get something. It's just not how much they thought they would get. They did not get the benefit they were promised. That's the difference. But they got something. They got a retirement benefit. It's not like they got nothing. No, it's not like they got nothing. But what they did not get is the retirement benefit that BP promised them at the time of conversion. Back on the causation, you did plead. One, they switched jobs. You're saying maybe less O and testified to that. And the second thing that you pled in that same paragraph was it, by being misled, it prevented them from altering their retirement strategies. So, for example, if I agreed to accept the Fifth Circuit position knowing I would have lifetime money, but then it turns out I didn't, it would have been very, I might have not accepted the appointment. Or I might have adjusted my retirement strategies. Correct. But if it's not known to you. My question is, that was a second theory of causation alleged. Can you think of a witness at the trial that said, gee, if I knew I wasn't going to get as much as I was promised, I would have altered my other assets. Can you think of any witness that got near that? I believe that all four witnesses indicated that they did. Well, that's not true of Sara Fujimoto. I believe Mr. Owen, Mr. Fujimoto, and Mr. Gunther all said they would have considered that they weren't getting what they believed they were getting in making future planning decisions. I do not believe Ms. Fujimoto did. I believe her testimony was, I was told I was getting exactly what I understood I was getting. I didn't have any reason to look further. I was good to go. Nothing changed. That was her testimony. And so what is her testimony as to what she would have done differently? She did not. She's the only one who did not testify. What about the others? What's the evidence that somebody would have acted differently had they had this information? The other three testified had they known this, they may have made different financial decisions because they would not have been relying on a benefit that they weren't going to get. What were those? Just give me an example. Say that again. What different decision would they have made? One of them talked about financial planning. One of them talked about employment. I apologize. I do not remember which employees testified to those. On your fairly traceable side of this, when we talk about it being fairly traceable, those plaintiffs did work under mistaken belief. And the district court did an excellent job of defining that out and showing where they worked under a mistaken belief that their RAP plan benefits would exceed the average final pay plan. And just quickly, what the district court's findings were as to actual misrepresentations? They're numerous. Yeah, but what do you think are the most sort of salient and obvious and disturbing? Sure. I think the ones that are important is first, the district court started out finding that BP was acting as a fiduciary in making those. And that it finding a fact number 93, that it breached its duties under 404 by only promoting the positive aspects, which was an exaggeration of benefits. They did it to retain employees. They promised a comparative benefit with no warning that there could be less than that comparative benefit. And they removed an early retirement benefit without explanation of its financial impact on employees. Then the district court made several findings that they were specifically promised a benefit that was comparative to or greater than. I heard Mr. Hicks say that they were told there was a chance that would not be true. I would urge the court to look at finding a fact 57 in the short brochure language, finding a fact 58 in the long brochure language, finding a facts 59, 60, 62, 65, which was a slide that they presented to employees informing them that the brochure was a lasting reference piece and they were to rely on that with those representations. They were going to get that comparable benefit. Finding 73 through 75, which included the Ross letter, telling them that the retirement benefit to career employees was comparable to the fully competitive benefit of the existing plan. And finding number, finding a fact 80 with the long brochure that again repeats this benefit promise. Are these misrepresentations as found by the district court all roughly in the time period of 1989? Yes. Okay. So then that, you've got plenty of time. I guess I'll have two questions, but very different ones. Judge Sporkin was the ombudsman? Yes. Was his report entered during the trial? Yes, it was. And does it reiterate these as misrepresentations? It reiterates them, but in a slightly different way because Judge Sporkin was asked to do his investigation from a different angle. He did not have all the information. We were able to present at trial after discovery. He was informed that everything was done appropriately under ERISA and he started from that premise. But he did do the investigation that the benefit promise did not hold true. Assuming all of those facts are true, it sounds you do, to me, you have a difficulty with repose. I'm sorry? You have a difficulty with the statute of repose. Your argument is primarily statutorily 413 doesn't apply or that you actually meet 413? That we meet 413. Okay. But so then what about opposing counsel's remarks that at least by 2011, Gunther himself is identifying these false statements? So Gunther is raising concerns and he's asking DP at that time, if you look at the evidence, to give him a comparison so he can have actual knowledge if he's getting what they're promising. Right. But I mean, tell me if I'm wrong. And I, you know, I have looked at the record, but I can look at anything more searchingly. Weren't all these people receiving monthly reports the way most of us do? And you would see the critical feature I hear is suddenly it's interest rate variable. Wouldn't they be able to see, oh my goodness, this isn't going to be an annuity. It's going to be fluctuating with the interest rates. So if you look at Judge Hank's findings of fact, it wasn't just due to the interest rate. That was the big, isn't that a fair to say it was the big determinant? No, it's not fair to say.  In fact, the district judge found that in repeated communications from the actuarial, which was Kwasha Lipton, BP was informed at certain times the promise they were making would not hold true. The promise that it would be comparable, their own modeling showed them at age 42 on, that wasn't true. The comparison modeling that Kwasha Lipton did for them showed it wasn't true. Right, but wasn't that it wasn't going to be true because the interest rates weren't going to be at 8%, no? No, it was just wasn't true because it wasn't as good of a plan. And it starts with the judge recognizing at trial that a final average pay plan is the richest plan out there. What they were offering was not competitive to it. And then it proceeded from there of Kwasha Lipton modeling for them that over time it would not. And I would urge you to look at finding a fact 26 that they knew they would receive less in normal retirement age even with the best interest rate they were modeling. Finding a fact number 28 that the final average pay plan was the richest. Finding a fact 32 that the actual actuarial modeling showed it was not true. Finding a fact number 34. Those are helpful and we'll look and you did list in chart form. I'm sorry, what was the last one you just said? There's more than 30. 34 is that the ARP outperforms the RAP at age 42 and beyond. 40 is that age 60 they get less to, they would be paying less because they didn't want to have the new plan pay more at age 65 than the old plan. Findings 41 through 42, the modeling showed less. And you put all these in your chart in your brief, right? I did. Finding 44 that a sample employee had a higher ARP and 45. Okay, so my question is back to the original one, the proposed question. If you have the amount of awareness that you were misled, that you're actually telling people in 2011 we were misled, what's the case that says that isn't equivalent to actual knowledge? What's your case, 413 case? Well, the employees didn't know that. It's a straight omission under the statute. Gunther, Gunther. Gunther did not know that. In 2011, Gunther suspected something wasn't right. And if you look in the case in the pleadings, and even some of BP's earlier filings, it was because Amico employees who were under a final average pay plan and have the same pay, same years of service, working side by side with them, but were still under the final average pay plan, were retiring with more money. So Gunther was feeling like something wasn't right there. And what's your case that says that isn't sufficient knowledge to trigger 413? Intel versus Salima. Okay, I'll just elaborate a little on that. Actual knowledge. That's not actual knowledge. He's guessing at that point. And he's asking BP to model. And he's pushing it so hard that BP then sends out what we call in the litigation the Rick Dorazel letter in 2011. And what does Rick Dorazel turn around and say to them? You got the benefit we promised you. He doesn't say, look, we promised you it would be comparable. And he knew that's what they were questioning. He does not say, we knew we promised you it would be comparable. He just says, we gave you what we promised. Quit beefing about it. And then they say, as it's still, they keep getting questions asking them to show that these retirees are going to get a comparable benefit. They say, take it to the ombudsman. Wait for the ombudsman. We'll let the ombudsman work this through so that you are at a comfort level that you got what we promised you. And then the ombudsman goes through the process and comes right back out and says, no, they didn't get what you promised them. So that's where we end up with an omission. And we don't have the trigger under the statute of limitations of actual knowledge. Gunther doesn't have actual knowledge. And in Judge Hank's findings, he puts a finding that BP refused to give Gunther the information that would have given him actual knowledge. So he's guessing at that point. And he's guessing based on a false premise. He's comparing his benefit to a different legacy group's benefit. And that's not actual knowledge. So what do you say the last act was? The last act was in our briefing as we set it out, as we argued to the court, and as the trial court found, when BP finally issued a letter to employees following the ombudsman's investigation saying, we are not going to change your benefit formula. They still weren't forthcoming. They still didn't say, it's not comparable. They just said, we're not going to change it. And I think, though, that that's fair knowledge, and that they know they're not going to do anything. The judge actually found they didn't have actual knowledge of the shortfall until an expert was engaged, took their numbers, and worked through the formula. But I think it's fair for this litigation and the position we took in filing the case, that we knew as a- So your position is, it isn't a continuing offense because they failed to correct it. It's, you're pegging it at that letter. We're saying that under the first trigger, it's an omission case. And they never corrected it. They said they would correct it after the ombudsman's investigation. They did not. And then, even if you end up saying, we're not persuaded by that, you go down to a fraudulent concealment. And we also say, that trigger is there. They fraudulently concealed it. There was information asymmetry. And the district court made no findings of fraudulent concealment, correct? Or you would disagree? The findings of fact the district court gave does support fraudulent concealment, although he does not call it fraudulent concealment. The district court goes through and shows all of the information BP had and did not disclose. And the district court goes two prongs for the fraudulent concealment. One is that they have knowledge. And the second is that they have a reason to not share that information. And it goes through, the district court goes through. And the reason BP did not want to tell the employees that its new plan was not competitive to the market and other entities out there is because they were worried about retaining their employee. And the district court made several findings that that was their goal. Do an information campaign. Do not alarm the employees. So they won't leave. One of the slides that is in evidence, BP compared itself to Conoco, Richland, other big oil companies out there. And their current plan was competitive. The new plan may not have been as competitive. And so they talk about the employee environment. They tell the managers who are the trainers, they call them. They tell those trainers to be sure and present the plan in a way that it doesn't cause concern among the employees. Their internal discussions are we need to retain employees. So the district court made the finding that supports that there is fraudulent concealment under that third trigger. There's an omission, it's material, and it's done for a purpose to benefit the plan sponsor as the employer. So those facts are in your record. And I would submit that those facts combined get you to the fraudulent concealment even though the district judge did not call them fraudulent concealment. I believe under the outcome decisions such as you discuss in your Ortiz case that this court has the power to look at what the judge's findings and conclusions were. And do you have any final thought just on the Amara litigation not really resolving standing because it was never directly addressed? I just have to disagree with that. I do not believe the Supreme Court would take a case nor as heavily litigated as that case was that everybody would overlook standing. I believe that they're right in line with what I have been urging. The Supreme Court has repeatedly told lower courts that we should not impute drive-by jurisdictional rulings to their opinions. Fair enough. But I don't think that's a drive-by. Well, where did they analyze standing? What pages? I don't have pages where they analyze standing, but I have pages where they discuss that it is a promise of a benefit that the employees don't receive and it's beyond just that near statutory violation. They don't get the benefit of the promise. Right, that's a merits analysis and we're absolutely bound by that, but it's not a jurisdictional analysis. It can tie into a jurisdictional analysis because when you're looking at a harm that's traceable to the challenge to conduct, the harm is we make you a promise. We don't fulfill the promise. Your side of the promise is to continue your employment. You fulfill it. You do have a traceable harm that's individualized to those individuals and that traces back to the failure to perform the promise. Okay, thank you. Thank you. We'll now hear the rebuttal. Thank you, Your Honor. Just a few points I'd like to make in rebuttal corresponding to some of the larger issues in the case. First, on the causation case, I did hear that there's supposedly testimony from some of the plaintiffs, not all of the plaintiffs, supposedly filling in that that was not argued in the brief, so it's new to me, but even if that were the case, and it certainly didn't warrant any findings in the district court's decision, which didn't address standing, but then I think you face a serious class certification problem because now we've got different plaintiffs. We've got the causation, Article III causation determination turning on different plaintiffs' testimony. So I think that doesn't solve the problem and I think it only introduces a new one. The second point I'd like to make is in regards to the Office of the Ombudsman process. This is a non-binding, non-legal mechanism that was put into place solely for employee relations purposes, predominantly to address safety concerns. And I want to point out a couple of things that the Office of the Ombudsman said in relation to this case and how it is, I think, irrelevant to the proposed issue. First of all, when the Ombudsman first received the concerns, this is at Record 21443. This is the first thing that it sends back to the employees. I believe the first thing, but it's certainly an email that says, Dear Concerned Employee, and it's a lengthy email, but it says, The OOO, Ombudsman's Office, has reviewed BP's legal analysis of the concern and concluded that the actions were all within BP's rights and implemented in accordance with the appropriate and controlling laws. It goes on to say, The OOO process is not a substitute for seeking legal advice. Employees should feel free to consult counsel of their choosing on what is the appropriate action for each of them individually on matters that may have statutes of limitations or other barriers. So not only is the Office of Ombudsman not a legal mechanism, it's not some sort of tolling mechanism, which, of course, doesn't apply in statutes of proposed anyway, according to the CTSB Wallbreaker case, but the Ombudsman is actually putting them on notice, warning them, saying, If you have statute of limitations issues, don't look to us. File your suit. And they didn't until April 2016. And even at the end of the Ombudsman's process, and this is at record 27933, the Ombudsman again reiterates that it found, quote, no legal issues for reconsideration. It was all just sort of an employee relations thing that has no legal binding effect as recognized by the Ombudsman and certainly not as the statute of limitations. And on the statute of limitations point, I want to say one other thing about, I heard counsel say that notwithstanding all of these communication statements in 2011 by Mr. Gunther, certainly later in February 2013, that he didn't know all that actual knowledge requires, and this is under both the statute and this court's Babcock decision, is actual knowledge of the violation. And certainly everything that Mr. Gunther says in 2011 and 2013 is all about this alleged violations. He says in 2013, February, we were made several promises that were not kept. These turned out to be very false statements. These were incorrect and misleading claims that are documented in the letters from BP management and literature. So everything is there for actual knowledge. And certainly, as we note in our brief, all of the circuit courts that have addressed the issue say that there is this point at which plaintiffs have some diligence as well. Now, I think you don't even need to get into diligence here because this is plainly actual knowledge of the violation, but you have that as well. I also heard, I want to talk a little bit about those violations. I heard counsel refer you to many findings of fact, but frankly, those findings of fact are clearly erroneous. As we pointed out in the 1989 communications and the findings of fact don't mention this, counsel didn't mention this, that they say over and over that you are not guaranteed an equal benefit unless you are 50 years or older. And in fact, you might be getting a lower benefit. And here's all the factors that go into that, including interest rates. So I simply don't think that you want to look to the district court's findings in determining what those 1989 communications actually said. And the final point I'll make is just to keep in mind the purpose of ERISA. It's a balancing act. It's a very carefully reticulated mechanism. It's designed both to protect workers who are offered a plan, but also to incentivize providing retirement plans to employees. And in a case like this, to uphold this after what I think are obvious problems, I think is just disincentivizing employers completely. Okay, your time is up. We appreciate both sides' arguments and we will decide this case. And we have now concluded this panel's oral arguments this week. Thank you.